UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEW VISION HOME HEALTH CARE and
SALEEM BIN SHAKOOR,

        Plaintiffs,

v.                  Case Number: 08-11704
                  Hon. David M. Lawson
MICHAEL LEAVITT, as Secretary of the United
States Department of Health and Human Services,
KERRY WEEMS, as Administrator of the Centers
for Medicare and Medicaid Services, NATIONAL
GOVERNMENT SERVICES, and LINDA MANN,
as Manager of Benefit Integrity Investigations for
TrustSolutions, LLC,

        Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION TO DISMISS AND DISMISSING CASE

  The plaintiffs in this case, New Vision Home Health Care and Saleem Bin Shakoor, a home health care agency, brought this action to challenge an audit under the Medicare Act, 42 U.S.C. § 426 *et seq*. The defendants are Michael Levitt, Secretary of the United States Department of Health and Human Services, Kerry Weems, Administrator of the Centers for Medicare and Medicaid Services, National Government Services, and Linda Mann, manager of benefit integrity investigations for TrustSolutions, LLC. The defendants have filed a motion to dismiss contending that the Court lacks subject-matter jurisdiction over this case because the plaintiffs have failed to exhaust administrative remedies. The plaintiffs counter that their request for relief is collateral to issues that might be addressed in an administrative audit, and therefore the case meets a very limited exception to the jurisdictional bar of 42 U.S.C. § 405. The Court scheduled a hearing on the present motion and deferred a hearing on the plaintiffs' motion for a preliminary injunction. Oral argument

was conducted on June 10, 2008, after which the Court allowed the plaintiffs to file a supplemental brief in support of a contention made at oral argument. Both parties filed supplemental briefs. The Court now finds that it does not have subject-matter jurisdiction over the plaintiffs' claims and will dismiss the case.

I.

The plaintiffs allege that a post-payment review of Medicare claims being conducted by the defendants is motivated by hostility directed against plaintiff Shakoor because of his national origin. He seeks, among other things, an injunction terminating the audit, which the plaintiffs believe is merely a tool for harassment.

New Vision furnishes physical therapy services to home-bound patients, among others. Plaintiff Saleem Bin Shakoor, a naturalized citizen originally from Pakistan, is the owner of New Vision, which qualifies as a home health agency (HHA) and provider of Medicare home health services within the meaning of 42 U.S.C. § 1395x(o), (u). Many of New Vision's patients are eligible for Medicare coverage, and therefore New Vision looks to Medicare for payment for its services.

After rendering services, New Vision submits claims for Medicare Part A reimbursement to defendant National Government Services (NGS), the Medicare Part A "fiscal intermediary" for Michigan. As an intermediary, NGS is responsible for "[d]etermining the amount of payments to be made to providers for covered services furnished to Medicare beneficiaries" and "[m]aking the payments." 42 C.F.R. § 421.100(a). However, NGS does not have primary responsibility for investigating fraud. That task lies in the hands of TrustSolutions, a Medicare "program safeguard contractor" (PSC). TrustSolutions holds a contract with Medicare pursuant to the Medicare Integrity

Program.  *See* 42 U.S.C. § 1395ddd.  As a PSC, TrustSolutions is charged with investigating Medicare fraud and abuse, and, to accomplish the task, it may perform cost-report audits and analyze the services provided.

New Vision explains that because its patients average seventy-five years of age, they "can require more visits to attain the necessary [physical therapy] goals"; "elderly patients simply cannot tolerate therapy sessions the same as a 65 year old or younger."  Mot. to Dismiss, Ex. 2, Letter to P. Carroll, Gov't Task Leader, at 1.  *See also* Mot. to Dismiss, Shakoor Aff. at ¶ 4.  The higher frequency of therapy sessions apparently led to the government's suspicion in this case, prompting an audit request.

On December 11, 2006, TrustSolutions, at the direction of manager Linda Mann, initiated a pre-payment review of physical-therapy claims submitted by New Vision.  Under Medicare, PSCs conduct both pre- and post-payment reviews.  *See Farkas v. Blue Cross & Blue Shield of Michigan*, 24 F.3d 853, 854 n.1 (6th Cir. 1994).  "'The primary goal of prepayment utilization screening is to ensure that Medicare pays only for medically necessary services . . . .  Prepayment controls . . . [allow the carrier to better monitor] services provided by problem providers before a claim is processed.'"  *Ibid.* (quoting *Farkas v. BCBSM*, 803 F. Supp. 87, 88 (E.D. Mich. 1992)).

As noted above, TrustSolution's review of New Vision was triggered by New Vision's billing patterns, which, according to the defendants, implied an "overutilization of not-medically-necessary therapy services."  Br. in Supp. of Mot. to Dismiss at 7.  As part of the pre-payment review, NGS sent New Vision "additional discovery request" (ADR) notices for fifty-one of its claims in mid-December 2006.  The parties have not furnished the ADR requests, and they dispute whether the defendants informed New Vision that its claims were under review.  Nevertheless,

plaintiff Shakoor responded to the requests, submitting, among other things, 485 care plans and clinical notes. On April 25, 2007, NGS notified the plaintiffs of its decision on the claims, "noting all therapy services denied and most nursing visits denied as 'not reasonable and necessary.'" Mot. for Prelim. Inj., Ex. 4, Guenin Letter at 2. (The interaction between TrustSolutions and NGS in all this was as follows: "TrustSolutions notified NGS of its determination and NGS issued a remittance notice to New Vision either paying, partially paying, or denying payment for the claim." Br. in Supp. of Mot. to Dismiss at 7-8.)

The pre-payment review continued for some time, with NGS continuing to deny the vast majority of claims at TrustSolutions's request. In early June 2007, New Vision's attorney, Elizabeth Zink-Pearson, contacted Linda Mann, manager of investigations for TrustSolutions, inquiring about the audit. Mann responded on June 15, explaining the reason for the review and stating that the review would continue, but noting New Vision could "take appeal actions as desired." Mot. for Prelim. Inj., Ex. 5, Mann Letter. TrustSolutions terminated the pre-payment review on January 9, 2008.

In the meantime, and as a result of the high error rate found (approximately 90% of the payment denials were reversed), TrustSolutions implemented a post-payment review of claims submitted by New Vision from January 2004 to December 2006. On July 31, 2007, TrustSolutions asked New Vision to furnish additional documentation in support of claims paid by NGS during this time period. New Visions sent to TrustSolutions on 225 of these claims in September 2007. According to a letter sent by the Centers for Medicare and Medicaid Services (CMS), the post-payment audit was still underway as of January 9, 2008, and the defendants confirm that remains the case.

Although the complaint only seeks relief with respect to the post-payment review, the plaintiffs have devoted much of their brief discussing the pre-payment audit as well. They apparently believe evidence of impropriety concerning the pre-payment review makes impropriety more likely in the context of the post-payment audit. And there is considerable evidence that TrustSolutions fumbled the audit of several claims. As the defendants acknowledge in their brief, as of May 5, 2008,

> New Vision had requested that NGS perform a redetermination of 79 of the 117 claims that had been denied, in full or in part, during the pre-payment review. Of those 79 claims, NGS affirmed the initial determination for 66 claims (i.e. agreed that the claim should be denied), reversed the initial determination for three claims, and partially reversed the initial determination for two claims. Eight claims still are pending before NGS for redetermination.

Br. in Supp. of Mot. to Dismiss at 8-9.

In their complaint, the plaintiffs challenge only the post-payment review. They bring counts for breach of the duty of due care (against TrustSolutions only) (Count 1), arbitrary and capricious agency action in violation of law (against all defendants) (Counts 2-3), and violation of the Equal Protection Clause (against all defendants) (Count 4). The plaintiffs also bring a count requesting a writ of mandamus (Count 5) ordering the Secretary of Health and Human Services to promulgate regulations governing the activities of the Program Safety Contractors. The plaintiffs theorize that they were targeted because New Vision is owned by a Middle Easterner, and the audit is simply being used as a tool of harassment. In terms of relief, the plaintiffs ask the Court to (1) grant a permanent injunction barring further post-payment review; (2) declare TrustSolutions' actions arbitrary and capricious and in violation of law; (3) order the Secretary to promulgate regulations that reign in the activities of Program Safety Contractors; and (4) award attorney's fees under the Equal Access to Justice Act.

The plaintiffs say they have presented their complaint to the Secretary, and also demanded relief from TrustSolutions and CMS, but there is no administrative process available to pursue this complaint. On January 19, 2008, counsel for the plaintiffs wrote a letter to the Secretary, which he says amounted to "presentation" of the claim. The letter reads as follows:

> Dear Secretary Leavitt:
>
> This letter is intended to present the claim against Trust Solutions, LLC, a PSC Contractor, and CMS Region V staff for ongoing failure to use due care, discriminatory conduct, and defamation towards and against New Visions [sic] Home Health Care Inc. in the initiation, continuation and implementation of a program safeguard audit based on allegations of unnecessary services that have been proven to date to be false and without basis in fact. My client has been severely damaged economically as well as having his business reputation impacted by the unwarranted investigation and communication to various entities accusing my client of what amounts to fraud. As there exists no administrative process to proceed with these complaints, I am presenting the claim to you.
>
> I am enclosing correspondence concerning the issues with Trust Solutions LLC and CMS Region V. If you have any questions or wish to discuss the complaint further, please do not hesitate to contact me at my office.
>
> Sincerely,
>
> s/ Elizabeth Zink Person
> Elizabeth Zink Pearson

Mot. for TRO, Ex. 12, Letter to Sec.

Also on January 19, counsel for the plaintiff sent a similar letter to Donna Morros Weinstein, Chief Counsel of the Office of General Counsel for the Department of Health and Human Services. The letter reads:

> Dear Ms. Weinstein:
>
> I represent New Visions [sic] Home Health Care, Inc. and am writing you to place a complaint against the Program Safeguard Contractor Trust Solutions LL. I am enclosing correspondence with staff at Trust Solutions LLC to insist that they

discontinue any further false and defamatory statements about New Visions [sic] Home Health Care Inc. and to end all further "investigation" in the form of post-payment or pre-payment audits of claims that are based on false allegations of unnecessary services. I ask you to investigate the internal operations of Trust Solutions LLC as I suggest that they have not complied with established rules and procedures for identifying providers to target for investigation.

In fact, I submit to you that the investigation of New Visions [sic] has nothing to do with actual unnecessary services or truly aberrant billing patterns. Instead, I believe the pre-payment and pending post-payment claim reviews were initiated either because [of] (1) the owner's middle eastern ethnic background, or (2) the fact that this agency historically has performed on an average 16 or more therapy visits an episode for patients receiving therapy services. Under the PPS payment system in place until January 1, 2008, home health agencies were reimbursed at the highest rate when more than 10 therapy services were provided. They received no more payment if they provided 16 visits than they would if they provided 11. Indeed, providing these extra visits in many cases caused New Visions to lose money on the services. Therefore, the increased therapy services did not in any way damage the program . . . up to this year, but starting this month, the reimbursement scheme has increased the therapy thresholds, and a higher reimbursement rate is paid for 14 or more therapy visits in an episode.

I submit the Trust Solutions "investigation" of New Visions [sic] was in part a means to discipline New Visions [sic] future conduct to reduce the overall therapy utilization and not in any way based on alleged "unnecessary" or "unreasonable" services. In that regards, it is important to note that to date, every claim denial made by Trust Solutions that has reached the Administrative Law Judge setting has been fully overturned and all services deemed reasonable and necessary. I presume you understand the burden this wrongful investigation has placed on my client. And I ask that you include in your review the QIC First Coast Options who we learned were using only social workers to conduct the review at the QIC level. Surely such staff do not have the requisite or necessary skills to asses the necessity of therapy or other clinical services which evidence here again the lack of due care in the performance of their duties. It is no wonder that this QIC chooses to rubber stamp over 90% of Trust Solution denials – and these are both for-profit entities that benefit from such denials.

I am enclosing recent correspondence from me to Trust Solutions and CMS staff to demand that all further auditing of New Visions [sic] ceases. I believe that in light of the ALJ reversals, there exists no way to justify any further auditing of New Visions [sic] and continu[ing] to do so will cause my client serious damage. I ask that you advise me of the result of your investigation into this complaint.

Mot. for TRO, Ex. 12, Letter to Chief Counsel.

The plaintiffs filed their complaint in this Court on April 22, 2008, along with a motion for a temporary restraining order and preliminary injunction. The defendants filed the present motion to dismiss for lack of subject-matter jurisdiction on May 21, 2008. Although the Court had originally scheduled the injunctive motion for a hearing before the motion to dismiss, it adjourned that hearing in favor of the present motion.

II.

The defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1), contending that this Court lacks subject-matter jurisdiction over this case because the plaintiffs have failed to exhaust administrative remedies as required by 42 U.S.C. § 405. The defendants argue the plaintiffs first must follow the established procedure for appellate review under Medicare before they can seek relief from this Court, which they have not yet done. The defendants argue that the plaintiffs first must present their constitutional argument in the administrative forum before bringing it to the courts, and the only avenue for judicial review is via section 405(g), which requires exhaustion of administrative remedies.

The plaintiffs counter this argument by asserting that their complaint does not address itself to the denial of individual claims for payment. Instead, they insist that they are entitled to attack the procedure wholesale because it is being misused to harass them due to their national origin, thereby denying them the equal protection of the laws. At oral argument, the plaintiffs represented to the Court that this constitutional issue, which forms the basis of their claim, cannot be presented in an administrative forum designed to review individual claim denials. They contend that because they are mounting a procedural or systemic attack on the post-payment review process in general, exhaustion is not available and therefore not required.

Rule 12(b)(1) authorizes dismissal where subject matter jurisdiction is wanting. Lack of subject matter jurisdiction may be asserted at any time, either in a pleading or a motion. Fed. R. Civ. P. 12(b)(1); *Television Reception Corp. v. Dunbar*, 426 F.2d 174, 177 (6th Cir. 1970). When subject matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Michigan Southern R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568, 573 (6th Cir. 2002); *see also Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

Both parties agree that a provider claiming wrongful denial of payment (or a patient claiming wrongful denial of benefits) under Medicare must exhaust administrative remedies before turning to the courts. The administrative process is extensive, and the exhaustion requirement is broad. The statutory basis for this requirement is 42 U.S.C. § 405(g), which allows judicial review only after administrative remedies have been exhausted, and section 405(h), which states:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h).

As the plaintiffs have stated, the administrative review process presumes an "initial determination" by the carrier. *See* 42 C.F.R. § 405.807. Initial determinations include decisions as to "[t]he coverage of items and services furnished." *See* 42 C.F.R. § 405.704(b). If a provider disagrees with a carrier's initial determination, the provider may request the carrier to review the decision, *see* 42 C.F.R. § 405.807, or may seek administrative review and hearing by the Secretary

of the Department of Health and Human Services, *see* 42 U.S.C. § 1395ff(b). After exhausting administrative procedures, the healthcare provider may seek judicial review pursuant to the mechanisms provided by the Social Security Act, 42 U.S.C. § 405(g). *See United States ex rel. Rahman, v. Oncology Assoc., PC*, 198 F.3d 502, 512-13 (4th Cir. 1999).

Although this procedure is best suited to contests over discrete payment disputes, blanket challenges are handled no differently. In *Heckler v. Ringer*, 466 U.S. 602 (1984), the Supreme Court explained that as long as the claim arises under the Medicare Act, the route to the courts passes only through section 405(g). In that case, three individuals who had been denied Medicare reimbursement for bilateral carotid surgery at some, but not all, administrative levels brought suit challenging the Secretary's ruling that the surgery was not reasonable and necessary. They were joined by a man who had declined the surgery because he could not afford it. The complaint sought a declaration that the Secretary's position on bilateral carotid surgery (a blanket policy) was unlawful; an injunction compelling the Secretary to instruct her intermediaries to cover surgeries of this variety; and an injunction barring the Secretary from forcing surgery patients to pursue administrative appeals in order to secure payment. The Court observed that "[t]he third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *Id.* at 614 (footnote omitted). Therefore, the Court concluded, "all aspects of respondents' claim for benefits should be channeled first into the administrative process which Congress has provided for the determination of claims for benefits." *Ibid.* The Court explained its reasoning, with particular emphasis on the breadth of the exhaustion requirement, as follows:

> In *Weinberger v. Salfi*, *supra*, 422 U.S., at 760-761, we construed the "claim arising under" language quite broadly to include any claims in which "both the standing and the substantive basis for the presentation" of the claims is the Social Security Act. In that case we held that a constitutional challenge to the duration-of-relationship eligibility statute pursuant to which the claimant had been denied benefits, was a "claim arising under" Title II of the Social Security Act within the meaning of 42 U.S.C. § 405(h), even though we recognized that it was in one sense also a claim arising under the Constitution.

*Id.* at 615.

The *Ringer* Court recognized only two exceptions to this broad general rule. One, not applicable here, is when the Secretary waives the exhaustion requirement. The other is exemplified by *Mathews v. Eldridge*, 424 U.S. 319 (1976), a case in which "the plaintiff asserted a procedural challenge to the Secretary's denial of a pretermination hearing, a claim that was wholly 'collateral' to his claim for benefits, and where he made a colorable showing that his injury could not be remedied by the retroactive payment of benefits after exhaustion of his administrative remedies." *Ringer*, 466 U.S. at 617.

It is the second exception for which the plaintiffs here seek to qualify. They believe their position is bolstered by *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986), decided two years after *Ringer*. The respondents in that case brought a challenge to the constitutional viability of a Medicare regulation. At that time, Medicare precluded judicial review of Part B "amount determinations," which concern physician services and related medical needs. The Court held that the Act did not bar the respondents' claim, which was a challenge to the "*method* by which . . . amounts are determined." *Id.* at 681 n.11. After considering the legislative history, the Court concluded that "matters which Congress did *not* delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law." *Id.* at 680. It also observed that the exhaustion requirement was inapposite because

-11-

traditional administrative remedies contemplated a decision following a hearing, and the Secretary nevered enacted a regulation that called for a hearing. As such, "[r]espondents' attack on the regulation . . . [wa]s not subject to such a requirement because there [wa]s no hearing, and thus no administrative remedy, to exhaust." *Id.* at 679 n.8.

Eight years later, the Sixth Circuit decided *Farkas v. Blue Cross & Blue Shield of Michigan*, 24 F.3d 853 (6th Cir. 1994). The defendants say this case supports their argument for dismissal, essentially relegating *Michigan Academy* to an historical footnote. In *Farkas*, a physician sued the Secretary of Health and Human Services, alleging that he was improperly subject to a pre-payment audit. *Id.* at 854. The district court dismissed the case for want of jurisdiction, and the Sixth Circuit affirmed. The issue before the appellate court was simple: "Did the district court have jurisdiction over Dr. Farkas' P[re-]P[ayment ]U[tilization ]R[eview] claim, when he had neither presented his claim to the Secretary nor exhausted the administrative remedies available to him prior to seeking judicial review?" *Ibid.* The Sixth Circuit found that it did not.

The Sixth Circuit began by noting that the Secretary has passed regulations that authorize carriers "to audit provider records to ensure that services for which reimbursement is claimed are 'medically necessary,' 'reasonable,' and otherwise payable under Part B." *Farkas*, 24 F.3d at 855 (quoting *Isaacs v. Brown*, 865 F.2d 468, 470 (2d Cir. 1989)). The Court explained that, although Medicare has always provided for judicial review of Part A benefit claims, it did not traditionally allow for judicial review of Part B claims. *Ibid.* However, following the *Michigan Academy* decision, Congress passed the Omnibus Budget Reconciliation Act of 1986, "so as to provide for judicial review of Part B amount determinations." *Id.* at 856. The issue before the Sixth Circuit, then, was "whether the holding in *Michigan Academy* authorizes federal question jurisdiction over

Dr. Farkas' claim under 28 U.S.C. § 1331 or whether instead Dr. Farkas is bound by the requirement of 42 U.S.C. § 405(g) that judicial review is available only 'after [a] final decision of the Secretary made after a hearing to which he was a party.'" *Ibid.* The court applied the broad exhaustion requirements and elected the latter option.

The claim presented by Dr. Farkas is parallels the arguments presented by the plaintiffs in this case. As the Sixth Circuit put it:

> Dr. Farkas argues that *Michigan Academy* is still good law, even after the 1986 amendment to the Medicare Act, and that it controls the outcome of his appeal. He contends that even though judicial review of Part B amount determinations is now available, after the presentment and exhaustion requirements of 42 U.S.C. § 405(g) have been satisfied, his claim here is one challenging the methodology of Part B determinations, for which *Michigan Academy* still provides direct federal-question jurisdiction. He characterizes his claim as one "challenging the regulation that gives the Secretary the unbridled discretion to place him on PPUR on arbitrary and capricious grounds . . . . This is not an amount dispute but one over the methodology used by the Secretary to place providers on PPUR." He considers PPUR to be "a severe form of punishment " that "consistently results in denied claims which necessitate 'amount' hearings." He argues that he has a constitutional challenge in that the Secretary placed him under PPUR "solely [out] of vindictiveness," in retaliation for his lawsuit against BCBSM, which "sanction is extremely repugnant to basic due process requirements."

*Id.* at 859.

The court disagreed with Dr. Farkas's reading of *Michigan Academy*, holding that "the OBRA Amendments to the Medicare Act have deprived *Michigan Academy* of lasting precedential value." *Id.* at 860. The court explained its rationale as follows:

> Since claims under Medicare Parts A and B are now to be treated in identical fashion, a holding that a party may bring a methodology claim under Part B directly to federal district court, without having first presented a claim to the Secretary for a final decision, would mean that we would have to grant federal-question jurisdiction to a methodology claim under Part A of Medicare as well. This would in effect be a holding that *Michigan Academy* overrules the entire line of Supreme Court cases that has denied direct federal-question jurisdiction to claims under Part A. *See National Kidney*, 958 F.2d at 1132. This is a step, understandably, that we

-13-

>are not willing to take. We therefore will no longer apply the amount/methodology distinction to claims brought under Part B of the Medicare Act as a means of providing federal-question jurisdiction for such claims.

*Ibid.*

However, the court did not close the door entirely on the claim challenging pre-payment review. The court noted that Dr. Farkas could challenge the denial of payments in the administrative forum, and then look to the courts for relief after administrative remedies were exhausted.

The plaintiffs dispute the defendants' view that *Farkas* demonstrates the vestigial status of *Michigan Academy*, and they argue that its continued vitality is confirmed by *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000). The Court agrees, to a point. Certainly, the distinction drawn between Medicare Part A and Part B claims by *Michigan Academy* has evaporated in the light of new regulations establishing an administrative procedure for resolving disputes over the latter. But the *Shalala* Court confirmed that *Michigan Academy* is still good law to the extent it establishes that the exhaustion requirement cannot be enforced "where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Id.* at 19. This holding, the Court stated, "has the virtues of consistency with *Michigan Academy*'s actual language; consistency with the holdings of earlier cases such as *Ringer*; and consistency with the distinction that this Court has often drawn between a total preclusion of review and postponement of review." *Ibid.*

The plaintiffs argue that enforcing the exhaustion requirement of section 405(h) would mean no review at all of their constitutional claim because administrative law judges have no power to adjudicate constitutional claims. That argument must fail for two reasons. First, the underlying premise of the argument is false. The plaintiffs seem to contend that because ALJs are not Article III judges, they do not have power to provide equitable relief. Supp. Br. at 4 (citing *Northern*

*Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)). But that is different than lacking the power to decide the constitutionality of a practice. Despite being given additional opportunity to provide authority for their assertion, the plaintiffs have not delivered. Although their supplemental brief contains a number of citations to the Code of Federal Regulations, not one of them indicates that a discrimination argument cannot be made during the administrative process.

Second, even if their constitutional argument would not be entertained at the administrative level, the *Shalala* Court held that the exhaustion requirement must be utilized unless that process would result in the plaintiffs' claims *never* being heard. The Court rejected the plaintiff's claim in that case, holding that channeling the claims through administrative review would not "amount to the practical equivalent of a total denial of judicial review." *Shalala.* 529 U.S. at 20 (internal quotes omitted). Although the Court recognized that the plaintiff might suffer a burden, the Court was not willing to "hold that an individual party could circumvent § 1395ii's channeling requirement simply because that party shows that postponement would mean added inconvenience or cost in an isolated, particular case. Rather, the question is whether, as applied generally to those covered by a particular statutory provision, hardship likely found in many cases turns what appears to be simply a channeling requirement into *complete* preclusion of judicial review." *Id.* at 22.

Making a point that applies especially to the plaintiffs in this case, the Court dismissed the plaintiff's argument that it need not comply with presentment and the administrative appeals process because "a host of procedural regulations limit the extent to which the agency itself will provide the administrative review channel leading to judicial review." *Id.* at 23. The Court reasoned:

> The Council's members remain free, however, after following the special review route that the statutes prescribe, to contest in court the lawfulness of any regulation or statute upon which an agency determination depends. *The fact that the agency might not provide a hearing for that particular contention, or may lack the power to*

> *provide one*, *see Sanders*, 430 U.S., at 109 ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures . . ."); *Salfi*, 422 U.S., at 764; Brief for Petitioners 45, *is beside the point because it is the "action" arising under the Medicare Act that must be channeled through the agency. See Salfi, supra*, at 762. After the action has been so channeled, the court will consider the contention when it later reviews the action. And a court reviewing an agency determination under § 405(g) has adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide, *see Thunder Basin Coal*, 510 U.S., at 215, and n. 20; *Haitian Refugee Center, supra*, at 494; *Ringer*, 466 U.S., at 617; *Salfi, supra*, at 762, including, where necessary, the authority to develop an evidentiary record.
>
> Proceeding through the agency in this way provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges. Nor need it waste time, for the agency can waive many of the procedural steps set forth in § 405(g), *see Salfi, supra*, at 767, and a court can deem them waived in certain circumstances, *see Eldridge*, 424 U.S., at 330-331, even though the agency technically holds no "hearing" on the claim. *See Salfi, supra*, at 763-767 (holding that Secretary's decision not to challenge the sufficiency of the appellees' exhaustion was in effect a determination that the agency had rendered a "final decision" within the meaning of § 405(g)); *Eldridge, supra*, at 331-332, and n. 11 (invoking practical conception of finality to conclude that collateral nature of claim and potential irreparable injury from delayed review satisfy the "final decision" requirement of § 405(g)). At a minimum, however, the matter must be presented to the agency prior to review in a federal court. This the Council has not done.

*Id.* at 23-24 (emphasis added).

So it is with the plaintiffs here. The plaintiffs admit they have not invoked the administrative process, but they say they should be excused because their claim is "wholly collateral" to a claim for payment and there is no administrative process that specifically addresses their claim of abuse. However, although the plaintiffs may not be seeking to overturn a discrete decision regarding coverage (instead they object to the post-payment review *process*, not its results, contending that it is the product of racial discrimination and caprice), their complaint nevertheless *arises under* the Medicare Act. It is application of the Act and regulations promulgated thereunder that upsets the plaintiffs.

Although there may not be an administrative process for bringing the precise claims advanced by the plaintiffs prior to an initial determination, they are not without recourse. Like Dr. Farkas, New Vision and Shakoor "may challenge [the defendants'] decision in conjunction with a claim for any payments denied." *See Farkas*, 24 F.3d at 861. If the defendants reject this argument at the administrative level, the plaintiffs "may then seek review of that decision via the appeals process available within the Department of Health and Human Services and ultimately from the federal courts." *Ibid.* If a district court then determines that the post-payment review was improper, "it can issue the appropriate relief." *Ibid.* Requiring the plaintiffs to channel their claims through the administrative process would not "amount to the practical equivalent of a total denial of judicial review." *Shalala*, 529 U.S. at 20 (internal quotes omitted). "The fact that the agency might not provide a hearing for that particular contention, or may lack the power to provide one, is beside the point because it is the 'action' arising under the Medicare Act that must be channeled through the agency." *Id.* at 23. To be sure, this may be more burdensome for the plaintiffs than immediate judicial review. However, this Court cannot ignore the exhaustion requirement simply because a party "shows that postponement would mean added inconvenience or cost." *Id.* at 22.

III.

The Court finds that the sole basis for jurisdiction over the plaintiffs' claims in this case is 42 U.S.C. § 405(g). Because the plaintiffs have not exhausted their administrative remedies under 42 U.S.C. § 405(g) and (h), this Court does not have subject-matter jurisdiction over the claims.

Accordingly, it is **ORDERED** that the hearing on the defendants' motion to dismiss [dkt #14] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED**.

It is further **ORDERED** that the plaintiffs' motion for a preliminary injunction [dkt #4] is **DISMISSED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated: October 2, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 2, 2008.

s/Felicia M. Moses  
FELICIA M. MOSES

---